UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ROBBIE MELTON               )
              Plaintiff            )
                                          )
       v.                                )        NO. 1:09-CV-190
                                          )        COLLIER/CARTER
MICHAEL J. ASTRUE          )
Commissioner of Social Security   )
              Defendant          )


<u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the

disposition of the plaintiff's Motion for Judgment on the Record (Doc. 6) and defendant's

Motion In Support of the Commissioner's Decision (Doc. 10).

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the

final decision of the Commissioner of Social Security denying the plaintiff a period of disability

and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423.

For reasons that follow, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

<u>Plaintiff's Age, Education, and Past Work Experience</u>

Plaintiff was 54 years old at the time of the ALJ's decision (Tr. 17, 64). She has a sixth

grade education (Tr. 21), and past relevant work as a housekeeper (motel maid) and kitchen

1

helper (Tr. 17, Affidavit of Counsel, Doc. 7-1).[1]

Claim for Benefits

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on December 13, 2005, alleging disability as of October 4, 2005 (Tr. 64-68). The Social Security Administration (the "SSA") denied Plaintiff's disability claim (Tr. 49-51, 54-55). Following a hearing on the merits of her claim, an administrative law judge (the "ALJ") issued a decision on April 5, 2007 (Tr. 10-17). The ALJ found that, in light of the entire record evidence, Plaintiff was not entitled to disability benefits (Tr. 10-17). The Appeals Council denied review (Tr. 1-5). Plaintiff subsequently filed her complaint with this Court, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is

---

[1] The record does not contain the testimony of Vocational Expert ("VE") Rodney Caldwell, but a summary of his findings is set out in an affidavit prepared by Plaintiff's counsel. The Commissioner does not contest the accuracy of the summary that her prior work as kitchen helper was medium exertion, unskilled and motel maid was unskilled with light exertion. Both parties agree the affidavit is adequate to reflect the VE's findings, so the absence of those findings is not fatal to a review of this case.

engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the claimant makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the

decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since October 4, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3. The claimant has the following severe impairments: borderline intellectual functioning, residuals of bilateral carpal tunnel syndrome, and residuals of tarsal tunnel syndrome (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform unskilled, light work as defined in 20 CFR 404.1567(b), lifting 20 pounds occasionally, ten pounds frequently, standing and walking six hours, and sitting six hours.

6. The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

19. The claimant has not been under a disability, as defined in the Social Security Act, from October 4, 2005 through the date of this decision (20 CFR 404.1520(f)).

(Tr. 12-17).


## Issues Raised

Plaintiff raises the following issues:

1. The Commissioner erred in the evaluation of the evidence regarding Plaintiff's intellectual functioning.

4

2.  The Commissioner erred in making an "assumption" regarding Plaintiff's "real" IQ scores and inappropriately substituted his opinion for valid medical evidence.

3.  The transcript of the hearing is incomplete and does not include testimony from the Vocational Expert regarding the impact of IQ scores on the ability to perform work activities.

Relevant Facts

Medical Evidence

In 1995, Plaintiff underwent bilateral carpal tunnel release (Tr. 129).  Plaintiff's symptoms returned in September 2005 (Tr. 196-198, 128-129).[2]  A day after the October 4, 2005 alleged on-set of her disability, Plaintiff underwent carpal tunnel release on her left side (Tr. 64-68, 128, 190-191).  According to her treating physician, Dr. Walter King ("Dr. King"), Plaintiff was anxious to schedule a release of her right side (Tr. 127-128).  The procedure took place on October 26, 2005 (Tr. 188-189, 192).  Following the operations, Plaintiff "noticed some improvement in her symptoms" (Tr. 126-127).  Nevertheless, as Plaintiff was concerned her work as a cook and server might worsen her symptoms, Dr. King recommended that Plaintiff temporarily remain off work (Tr. 126-127).  During a follow-up appointment on December 22, 2005, Plaintiff informed Dr. King she had quit her job (Tr. 124).[3]

On February 17, 2006, Dr. James Lester ("Dr. Lester"), a state agency reviewing physician, completed a Physical Residual Functional Capacity Assessment (Tr. 207-214).  Based

---

[2]The year before, Plaintiff had tarsal tunnel surgery performed on her feet, after which her treating physician released her to return to work—work Plaintiff did until her alleged onset date (Tr. 174-182).

[3]
Between March 2006 and March 2007, Plaintiff was periodically treated as an outpatient at the Erlanger Medical Center for a variety of general medical complaints (Tr. 215-228).

on the evidence included in Plaintiff's medical file, Dr. Lester concluded Plaintiff was capable of: (i) lifting or carrying 50 pounds occasionally; (ii) lifting or carrying 25 pounds frequently; (iii) standing or walking for about six hours in an eight hour work-day; and (iv) sitting about six hours in an eight hour work-day (Tr. 208). Dr. Lester determined Plaintiff did not suffer from any manipulative, visual, communicative, or environmental limitations (Tr. 209-211). On February 21, 2006, George E. Fox, a vocational examiner, prepared a vocational analysis worksheet which essentially came to a similar conclusion finding Plaintiff capable of medium work with no manipulative, visual, communicative, or environmental limitations (Tr. 99-101).

Plaintiff was evaluated by a psychologist, Dr. David Thompson ("Dr. Thompson"), on June 11, 2007 (Tr. 118, 234-236). Plaintiff had been referred to Dr. Thompson for a psychological evaluation to determine Plaintiff's current levels of intellectual functioning and academic achievement (Tr. 234). At the time of her evaluation, Plaintiff was married with two children and had two grandchildren living with her and her husband (Tr. 234).

Dr. Thompson reported Plaintiff had a history of special education academic placement (Tr. 234). Dr. Thompson described Plaintiff, who was coherent and entirely comprehensible, as "alert and orientated in all spheres" (Tr. 234). Dr. Thompson assessed Plaintiff using the Wechsler Adult Intelligence Scale and Wide Range Achievement Test (Tr. 234). In the "Intellectual Assessment" section of Dr. Thompson's Report, Plaintiff received the following scores: (i) Verbal IQ of 58; (ii) Performance IQ of 51; and (iii) Full Scale IQ of 51 (Tr. 235). Dr. Thompson stated Plaintiff's "[v]erbal and perceptual motor skills appear equally deficient," and her Subtest Scaled Scores "reflect a relative strength in the general fund of information" (Tr. 235). In the "Achievement Test Results" section of his Report, Dr. Thompson noted Plaintiff's

academic achievement levels were "commensurate with expectations base [sic] on [Plaintiff's] demonstrated level of overall cognitive abilities and reveal Plaintiff is essentially illiterate" (Tr. 235). Dr. Thompson deemed the test results a valid and reliable indication of actual levels of ability (Tr. 234). He concluded Plaintiff demonstrated intellectual performance in the mild range of mental retardation (Tr. 236).

In August and September 2007, Plaintiff was treated at the Center for Sports Medicine and Orthopedics to address problems with her arms and wrists (Tr. 244-250). Plaintiff complained that while the carpal tunnel releases improved her condition, the symptoms had returned (Tr. 248). Plaintiff's treating physician at the clinic, Dr. Robert Mastey ("Dr. Mastey"), found her shoulders, elbows, wrists, and fingers all exhibited a "functional range of motion" (Tr. 250). Dr. Mastey did not deem it advisable for Plaintiff to undergo further surgical intervention—and noted, in any event, Plaintiff was not interested in doing so (Tr. 246). Dr. Mastey concluded Plaintiff was "now at the point of maximal medical improvement for both upper extremities" (Tr. 246). As a result, Dr. Mastey did not recommend any permanent work restrictions other than avoiding the use of "vibratory tools" (Tr. 247).

On October 11, 2007, Plaintiff was evaluated by consultative psychologist, Dr. David Caye ("Dr. Caye") (Tr. 118, 237-243, 256-258). As part of his evaluation, Dr. Caye conducted the following tests: (i) Intake Interview; (ii) Clinical Interview; (iii) Mental Status Examination; (iv) Wechsler Adult Intelligence Scale; (v) Wide Range Achievement Test; and (vi) Rey 15-item Test (Tr. 237). According to Dr. Caye, though Plaintiff had a sixth grade education, she could barely do first grade work (Tr. 238). Contrary to the information contained in Dr. Thompson's

Report, Plaintiff informed Dr. Caye that she had not been in any special education program.[4] She said she was passed from grade to grade without learning anything, able to write her name only (Tr. 238). Plaintiff informed Dr. Caye that she: (i) watched television three times a week for a period of three-to-four hours at a time; (ii) went grocery shopping three times a week; (iii) did household chores, such as sweeping, vacuuming, laundry, and cooking; and (iv) drove on her own (Tr. 238, 239). Dr. Caye described Plaintiff as alert and oriented (Tr. 239). Plaintiff "indicated adequate range of interest activities and social contacts within the family unit and absence of activities etc. outside of that grouping" (Tr. 239). Plaintiff's thoughts were free of paranoid and delusional materials and her ties to reality were intact (Tr. 239).

Plaintiff received the following scores on the tests administered by Dr. Caye: (i) Verbal Scale IQ of 60; (ii) Performance Scale IQ of 56; and (iii) Full Scale IQ of 54 (Tr. 240). Dr. Caye concluded that Plaintiff's test scores were "questionable as to validity," as there were "multiple errors noted of questionable origin" (Tr. 239). For example, when Plaintiff came to the word "City" on the Reading Subtest of the Wide Range Achievement Test, she stated "Chattanooga" instead of reading the actual word (Tr. 239). When asked what the word was, Plaintiff denied knowledge or awareness of it (Tr. 239). Likewise, when coming to the word "Grunt," a similar erroneous response was elicited, reading the word as "Hurt"; Plaintiff "indicated again that she could not read the word itself beyond that reading given" (Tr. 239). According to Dr. Caye, Plaintiff's failure to do so was feigned: "Clearly, she could understand the content of the word, thus able to read the word while denying ability to do so" (Tr. 239, 240). Dr. Caye discerned similar results on other subtests, including the Arithmetic Subtest and Picture Completion

_____

[4]Plaintiff confirmed this fact during the administrative hearing (Tr. 21).

Subtest (Tr. 240). In light of these (and other similar) responses, Dr. Caye concluded that Plaintiff's test scores could not be accepted as valid (Tr. 240).

Dr. Caye noted that Plaintiff had maintained full-time employment for approximately seven years, driven independently, prepared full meals, and maintained a family. According to Dr. Caye, Plaintiff's engagement in such activities required an intellectual functional capacity "well above" that which would be expected of an individual in the "mild-to-moderate range of mental retardation." In an attempt to evaluate the validity of Plaintiff's presentation and performance on the tests, Plaintiff's credibility was assessed by way of the Rey 15-item Test.[5] According to Dr. Caye, the Rey 15-item Test findings were "consistent with other test results, observed behavior and the interpretation of that behavior . . . nullifying her report as reliable and credible and severely impairing effective assessment of functioning in diagnostic issues" (Tr. 241). In the "Summary and Conclusions" section of his Report, Dr. Caye stated: "Test scores including IQ and achievement cannot be interpreted as scores are deemed invalid in her credibility to witness severely impinged . . . . Results of today's evaluation, the exception of the interpretation of validity and observed behavior, are deemed invalid." Dr. Caye did not diagnose Plaintiff with any form of mental retardation but all assessments were "deferred" (Tr. 242).

On February 5, 2008, Dr. Thompson submitted a letter to Plaintiff's counsel explaining the basis for his findings in light of Dr. Caye's evaluation (Tr. 118-119). Acknowledging that neither he nor Dr. Caye performed specific measures of adaptive behavior, Dr. Thompson

---

[5] Plaintiff was shown a stimulus card of 15 items; given ten seconds to identify the items, she managed to identify only three (Tr. 241). Notably, a score of nine or less results in a positive finding for feigned/magnified symptoms; as such, Plaintiff's score of three was "substantially below the cutoff score and highly positive for feign/magnified symptoms" (Tr. 241).

believed her scores on those types of measures would probably be "somewhat higher as it is evident that Plaintiff has adapted in many ways, having been married, raised children, paid bills, etc., out of absolute necessity" (Tr. 118). Dr. Thompson further acknowledged, unlike Dr. Caye, he did not evaluate the possibility of malingering (Tr. 118). In Dr. Thompson's opinion, the results obtained by Dr. Caye on the Rey 15-item Test "would normally indicate that she was either feigning or exaggerating either visual-perceptual or memory deficits" (Tr. 118-120).

Nevertheless, Dr. Thompson did not recant his conclusion that Plaintiff is mildly mentally retarded (Tr. 118). According to Dr. Thompson, Plaintiff likely "learned numerous basic adaptive scales [sic] such as dealing with store clerks, operating a vehicle, getting and raising children"—tasks she has accomplished "to at least a minimally adequate degree"—out of "necessity" (Tr. 119). In Dr. Thompson's opinion, instead of actually developing and maintaining such skills, Plaintiff likely had just been "winging it"—maintaining that Plaintiff's "apparent abilities" were "very superficial and apt to break down at the slightest stress or threat" (Tr. 119). Although Dr. Thompson acknowledged anyone making more than five or six errors on the Ray 15-item Test was "most likely attempting to feign a memory deficit," he contended that Plaintiff—who made 12 errors—was "not sophisticated enough to feign any type of memory or other deficits" (Tr. 119). Though such questions were not a part of Dr. Caye's Report, Dr. Thompson felt Plaintiff would "probably give positive responses to misleading questions such as, 'Do you hear voices or see things that other people don't see?'" and that "this would most likely represent her attempt to please the examiner or an honest attempt to be agreeable with a person perceived [sic] as an authority figure such as a doctor or an official" (Tr. 119).

On June 20, 2007, an ALJ held an administrative hearing to assess Plaintiff's DIB

application (Tr. 18-32). In his written decision, the ALJ determined Plaintiff had not been under a disability since October 4, 2005 because she could perform her past relevant work as a housekeeper despite her impairments (Tr. 13-22).

<u>Testimony of the Vocational Expert (VE):</u>

The parties stipulate Vocational Expert ("VE") Rodney Caldwell testified at the February 26, 2008 hearing before the ALJ. The record does not contain the testimony of the VE, but a summary of the testimony is set out in an affidavit prepared by Plaintiff's counsel. The Commissioner does not contest the accuracy of the summary to the extent her prior work as a kitchen helper was medium exertion, unskilled and work as a motel maid was unskilled, with light exertion. Both parties agree the affidavit is adequate to reflect the VE's findings, so the absence of those findings is not fatal to a review of this case.

<u>Analysis</u>

1. <u>The Commissioner erred in the evaluation of the evidence regarding Plaintiff's intellectual functioning.</u>

Plaintiff first asserts her I.Q. scores were not in the borderline range but were within the range included in Listing 12.05. The ALJ found Plaintiff to have borderline intellectual functioning and found her not to have an impairment or combination of impairments that meets or medically equals one of the listings (Tr. 12, 14). He found Plaintiff did not have a valid verbal, performance or full scale IQ of 59 or less. Finally, the ALJ found the "paragraph C" criteria of listing 12.05 were not met because the claimant did not have a valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function (Tr. 14). Because I

conclude there was substantial evidence in the record to support these conclusions, I conclude Plaintiff's listing level argument fails.

Plaintiff fails to meet the listing in two ways, first because she did not show that her significant subaverage intellectual functioning was in her developmental period and did not have deficits in adaptive behavior and second because she did not show valid IQ scores to support a listing level impairment.

As will be shown below, to meet Listing 12.05 there must be a significant subaverage intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). The only evidence of this in the record appears to be an erroneous note found in Dr. Thompson's medical records which indicated Plaintiff was in special education in her school years.

The relevant portion of the Listings at issue in this case is as follows:

**<u>Listing of Impairment 12.05</u>**

**12.05      Mental Retardation and Autism:**

**Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22). (Note: The scores specified below refer to those obtained on the WAIS, and are used only for reference purposes. Scores obtained on other standardized and individually administered tests are acceptable, but the numerical values obtained must indicate a similar level of intellectual functioning.) Autism is a pervasive developmental disorder characterized by social and significant communication deficits originating in the developmental period.**

**The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied**.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, or bathing) and inability to

follow directions, such that the use of standardized measures of intellectual functioning is precluded.

    B.  A valid verbal, performance, or full scale IQ of 59 or less;

OR

    **C.  A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing additional and significant work-related limitation of function**

OR

    D.  A valid verbal, performance, or full scale IQ of 60 through 70, or in the case of autism, gross deficits of social and communicative skills, with either condition resulting in two of the following:
    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
    4.  Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

(Emphasis added).

Plaintiff's argument relies almost exclusively, as it must, on the Report submitted by Dr. Thompson, who found Plaintiff demonstrated intellectual performance in the mild range of mental retardation (Tr. 236). (Pl. Br. at 7-11.) However, the ALJ decided to give the "greatest weight" to the opinion of Dr. Caye, not Dr. Thompson (Tr. 14). He gave good reasons for doing so.

Plaintiff contends the ALJ decided to favor the opinion of Dr. Caye over that of Dr. Thompson "without explanation (in fact with almost no mention of this report)." However, the ALJ dedicated a significant portion of his decision to these opinions (Tr. 13-15). As the ALJ

noted in his decision, and Dr. Thompson conceded in his February 2008 letter, Dr. Thompson's "assessment did not include a measure of possible malingering, whereas Dr. Caye's assessment did include such a measure" (Tr. 14, 118). The results of Dr. Caye's in-depth evaluation established that Plaintiff was feigning, or magnifying, her symptoms, nullifying the results of her IQ tests (Tr. 13-15, 239-242).

Plaintiff's attempt to confine these results solely to Dr. Caye's evaluation must fail. Plaintiff maintains her Rey 15-item Test scores, which even Dr. Thompson acknowledged "would normally indicate that she was either feigning or exaggerating either visual-perceptual or memory deficits," should only invalidate the results of Dr. Caye's evaluation: "This, continues the argument, leaves the only diagnosis and scores deemed valid to be those of Dr. Thompson, the other consulting examiner" (Tr. 118). (Pl. Br. at 8, 10.) I disagree. It was reasonable for the ALJ to conclude if Plaintiff feigned, or exaggerated, her symptoms during Dr. Caye's evaluation, she did so during Dr. Thompson's evaluation as well. Dr. Thompson admittedly failed to measure possible malingering (Tr. 14, 18). Therefore, I conclude the ALJ was well within his discretion to determine Plaintiff did not have a *valid* verbal, performance, or full scale IQ sufficient to satisfy Listing 12.05 (Tr. 14). 20. C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In addition, I note there was not a showing of deficits in adaptive behavior before age 22 as required by Listing 12.05. Plaintiff bears the burden of showing that she met or medically equaled all of the requirements of that listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.") (citations omitted).

Plaintiff relies on Dr. Thompson's letter, which attempts to cast doubt on Dr. Caye's findings and, thereby, further support his own opinion (Pl. Br. at 10-11). Plaintiff contends Dr. Thompson reviewed Dr. Caye's testing and "offered a well reasoned and psychologically sound explanation for the differences in opinions regarding the validity of the testing." (*Id.* at 10.) A review of Dr. Thompson's brief rebuttal letter suggests otherwise (Tr. 118-119). In the letter, Dr. Thompson conceded he failed to measure for either adaptive behavior or possible malingering (Tr. 118). While Dr. Thompson acknowledged the scores recorded by Dr. Caye "would normally indicate that she was either feigning or exaggerating either the visual-perceptual or memory deficits," he attempted to downplay Plaintiff's responses (Tr. 118-119). Dr. Thompson posited that Plaintiff would "probably give positive responses to misleading questions such as, 'Do you hear voices or see things that other people don't see?,'" which "would most likely represent her attempt to please the examiner or an honest attempt to be agreeable with a person a [sic] perceived as an authority figure such as a doctor or official" (Tr. 119). However, as Defendant argues, there is no evidence that Plaintiff was presented with such purportedly "misleading" questions. Dr. Caye's assessment was not based on "positive," or otherwise agreeable, responses but instead, in large part, on Plaintiff's apparently intentional failure to correctly respond to a series of questions testing her memory, arithmetic, and logic (Tr. 239-241)

Dr. Thompson's letter discusses Plaintiff's substantial and functionally demanding activities and concludes her abilities are superficial and apt to break down (Tr. 118, 119) In contrast, Dr. Caye points to Plaintiff's history of, *inter alia*, maintaining full-time employment, driving independently, preparing her own meals, and raising a family (Tr. 241). Dr. Caye opined

Plaintiff's ability to do so supported his contention that Plaintiff was feigning her symptoms, as the functioning capacity necessary to do so is "well above that which would be expected of an individual [with] the full scale IQ score in a mild-to-moderate range of mental retardation" (Tr. 241). Dr. Thompson disagreed. He contended that Plaintiff's "apparent" intellectual and social functioning skills were an illusion, constituting "very superficial" abilities that were "apt to break down at the slightest stress or threat" (Tr. 119). However, Dr. Thompson failed to point to a single instance of a "break down" occurring in Plaintiff's life to support this position, which appears to be unsubstantiated by the record.

In addition, as the Commissioner notes, Dr. Thompson submitted his report with the erroneous understanding that Plaintiff had been enrolled in a special education curriculum in her youth (Tr. 234). Plaintiff had never been so enrolled (Tr. 21, 238). The mistake is significant, given Listing 12.05's requirement that Plaintiff establish deficits in adaptive functioning that initially manifested themselves during development. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; *see also Dishman*, 2009 WL 2823653 at *13; *Foster*, 279 F.3d at 354. Whether Plaintiff gave false statements to Dr. Thompson during their initial consultation, or Dr. Thompson failed to carefully assess Plaintiff's background, is unknown. Either way, the factual error is problematic. It further undermines the report of Dr. Thompson.

Considering both doctors' perspectives in light of the evidentiary record, the ALJ decided to give the "greatest weight to the opinion of Dr. Caye" (Tr. 14). The ALJ found, contrary to Dr. Thompson's opinion, Plaintiff had not been merely "winging it" for the past 15 years; instead, Plaintiff had "many years of stable employment both as a kitchen helper at a nursing home and as a housekeeper," and engaged in work and daily living activities—including grocery shopping,

sweeping, vacuuming, laundry, cooking, and raising children—that suggested "greater functional capabilities than implied by the IQ scores and a finding of mild mental retardation" (Tr. 14). *See Jones v. Comm'r of Soc. Sec.*, Case No. 08-cv-562, 2009 WL 3498809, *11 (W.D. Mich. Oct. 26, 2009) ("[Claimant's] ability to raise her children was a relevant consideration."); *Carmack v. Barnhart*, 147 F.Appx. 557, 561 (6th Cir. 2005) ("Carmack's work history, which demonstrates her ability to perform complex tasks, belies her claim of mental retardation."); *McDonald v. Sec'y of Health and Human Services*, No. 85-3322, 1986 WL 16598, at *5 (6th Cir. Feb. 25, 1986) ("[T]he Secretary properly considered claimant's academic success, occupational success, independent living, and ability to care for herself as evidence that the 66 IQ test result was not representative of claimant's intelligence . . . . Accordingly, the Secretary's conclusion that claimant did not suffer from a listed impairment is supported by substantial evidence."). Dr. Caye's findings, in conjunction with Plaintiff's successful work history and daily activities, demonstrated greater functional capabilities than suggested by Dr. Thompson (Tr. 14-15)

The ALJ did not "simply ignore" Dr. Thompson's opinion. (Pl. Br. at 10.)[6] Nor did he "substitute his lay opinion for the medical opinion of experts." (Pl. Br. at 11.) Instead, in light of the evidentiary record, the ALJ decided to credit the opinion of Dr. Caye over that of Dr. Thompson. As the ALJ is not bound to accept any particular medical opinion, the ALJ's decision to credit the conclusion of Dr. Caye was entirely within his province as the fact-finder. 20 C.F.R. § 416.927; *Baker v. Comm'r of Soc. Sec.*, 21 F.Appx. 313, 315 (6th Cir. 2001) ("The

---

[6]

Plaintiff dedicates almost an entire page of her Motion to a lengthy quotation from a 1991 New Jersey case, *Lang v. Sullivan*, 762 F. Supp. 628 (N.J. 1991). (Pl. Br. at 9-10.) It is unclear, however, the precise proposition for which *Lang* is cited. To the extent that Plaintiff relies on *Lang* to support her contention that the ALJ failed to resolve an apparent conflict in the evidence, Plaintiff is mistaken. The ALJ did precisely that (Tr. 13-15).

Commissioner is not required to accept a claimant's I.Q. scores and may reject scores that are inconsistent with the record."). The ALJ is here weighing evidence that is conflicting. I conclude he had sufficient reason to reject the IQ score from Dr. Thompson in spite of the assessment of Dr. Thompson that they were valid. The ALJ's finding that Plaintiff was not mentally retarded is supported by substantial evidence.

Plaintiff bears the burden of showing that she met or medically equaled all of the requirements of that listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.") (citations omitted). Here, Plaintiff did not meet her burden.

2. <u>The Commissioner erred in making an "assumption" regarding Plaintiff's "real" IQ scores and inappropriately substituted his opinion for valid medical evidence.</u>

In this case the ALJ essentially finds there are no valid IQ scores. He relies on evidence of record that Plaintiff has the capacity to perform her past work because she has no significant limitations other that what he assesses as borderline intellectual functioning.

The Commissioner argues the ALJ afforded Plaintiff the "benefit of the doubt," in finding she suffered from borderline intellectual functioning (Tr. 15), and further argues the ALJ's finding is supported by substantial evidence. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (upholding finding that claimant operated in the borderline range of intellectual functioning, rather than being mentally retarded, even though her intelligence test scores, standing alone, would indicate mental retardation). Borderline

intellectual functioning reflects a lesser degree of intellectual impairment than mental retardation. *See* DSM-IV-TR at 48; *see also Childhood Disability Evaluation Issues* at 48 (Mar. 1998) (borderline intellectual functioning "refers to an IQ in the 71-84 range and without the level of associated deficits in adaptive functioning required for a diagnosis of Mental Retardation"). Evaluating Plaintiff's borderline intellectual functioning under the criteria of Listing 12.05, the ALJ concluded that her mental impairment was "severe" and precluded the performance of complex work activities (Tr. 15). However, the ALJ found that, despite her impairments, Plaintiff could still perform simple, unskilled work (Tr. 15). As the ALJ noted, Plaintiff had already "clearly demonstrated the capacity to perform unskilled work for many years in her past relevant work" (Tr. 15).

In rendering his decision, the ALJ found Plaintiff's work and daily living activities were inconsistent not only with her alleged mental deficits but also with her allegations of debilitating hand, wrist, and foot pain (Tr. 16). The evidentiary record established that, in addition to raising a family, Plaintiff: (i) watched television; (ii) went grocery shopping; (iii) did household chores (including sweeping, vacuuming, laundry, and cooking); and (iv) drove on her own (Tr. 16, 238). She sought little, if any, treatment for residuals of carpal tunnel syndrome from December 2005 through August 2007 (Tr. 16, 124, 244-250). In 2007, Plaintiff's treating physician found full functional motion in her fingers and wrists, and released Plaintiff to return to work with the only restriction of avoiding the use of vibratory tools (Tr. 244-250). Social Security Ruling ("SSR") 85-15 indicates that such a restriction would have little impact on the broad range of work in which Plaintiff could engage. Plaintiff's 2004 foot surgeries also successfully addressed her problems, and Plaintiff's treating physician released her to work that November—work Plaintiff

continued to do until her alleged October 2005 on-set date; there is no evidence in the record of any further problems with her feet (Tr. 16, 64-68, 174-182). Combined with the issues raised by Dr. Caye in his evaluation of Plaintiff, substantial evidence supported the ALJ's skepticism regarding the credibility of Plaintiff's allegations of debilitating pain: "Inconsistencies such as these do nothing to enhance credibility and make it impossible to rely primarily on subjective complaints" (Tr. 16).[7]

Dr. Lester, a state agency reviewing physician, concluded that Plaintiff was capable of: (i) lifting or carrying 50 pounds occasionally; (ii) lifting or carrying 25 pounds frequently; (iii) standing or walking for about six hours in an eight hour work-day; and (iv) sitting about six hours in an eight hour work-day (Tr. 99-201, 208). He determined that while Plaintiff had certain, mild postural limitations, Plaintiff did not suffer from any manipulative, visual, communicative, or environmental limitations (Tr. 99-101, 209-211). The ALJ's RFC finding comports with Dr. Lester's assessment, and substantial evidence supports the ALJ's RFC finding (Tr. 15-17). Plaintiff fails to present any evidence establishing that the ALJ acted unreasonably in finding that no additional limitations were warranted.

In light of Plaintiff's RFC and the physical and mental demands of her past relevant work, the ALJ correctly concluded that Plaintiff was able to perform her past relevant work as a

---

[7]

As a factual finding, the credibility determination of the ALJ is entitled to special deference. *See Cruse*, 502 F.3d at 542 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight."); *Jones*, 336 F.3d at 476 ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference . . . . [A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference."); *Villarreal v. Sec'y of Health and Human Services*, 818 F.2d 461, 464 (6th Cir, 1987) ("Determination of disability from pain is peculiarly within the province of the ALJ.")

housekeeper (Tr. 17).

    3. <u>The transcript of the hearing is incomplete and does not include testimony from the Vocational Expert regarding the impact of IQ scores on the ability to perform work activities.</u>

Finally, Plaintiff points to the absence of the Vocational Expert's testimony in the record. Although neither party disputes that a vocational expert testified at the administrative hearing, the administrative record does not include his testimony. (Pl. Br. at 11-12.) The Commissioner does not contest the recollection of the vocational expert's testimony contained in the affidavit of Plaintiff's counsel. (Pl. Br., Ex. A) Plaintiff does not contest the ALJ's summary of the vocational expert's testimony: "At the hearing, the vocational expert classified the claimant's past relevant work as a housekeeper as being unskilled, requiring light exertion" (Tr. 17). Nor does Plaintiff contend that she could not perform her past relevant work as a housekeeper were this Court to find that the ALJ's RFC finding is supported by substantial evidence. While the absence of the vocational expert's testimony is regrettable, the Commissioner agrees with Plaintiff's assessment that it is "not fatal to a review of this case." (Pl. Br. at 12). I agree in light of the agreed affidavit filed by Plaintiff's counsel.

<u>Conclusion</u>

For the reasons stated herein, I conclude there is substantial evidence to support the

conclusion of the ALJ and I therefore RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion In Support of the Commissioner's Decision (Doc. 10) be GRANTED, and plaintiff's Motion for Judgment on the Record (Doc. 6) be DENIED.[8]

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[8]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  _Thomas v. Arn_, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide _de novo_ review where objections to this report and recommendation are frivolous, conclusive or general.  _Mira v. Marshall_, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  _Smith v. Detroit Federation of Teachers_, 829 F.2d 1370 (6th Cir. 1987).